UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

| | |
|---|---|
| **BENSON PHILIP GATU NJUGUNA** | **CASE NO. 6:20-CV-00560 SEC P** |
| **VERSUS** | **JUDGE MICHAEL J. JUNEAU** |
| **ERIC STAIGER, ET AL** | **MAGISTRATE JUDGE HANNA** |

**REPORT AND RECOMMENDATION**

Before the Court is a petition for writ of habeas corpus (28 U.S.C. § 2241) filed by pro se Petitioner Benson Philip Gatu Njuguna. Petitioner is an immigration detainee in the custody of the Department of Homeland Security / U.S. Immigration and Customs Enforcement ("DHS/ICE"). He is detained at the Pine Prairie ICE Processing Center ("PPIPC") in Pine Prairie, Louisiana. Petitioner alleges that humanitarian parole is justified as he has serious medical conditions and faces an elevated risk of contracting COVID-19. [Rec. Doc. 1]

This matter has been referred to the undersigned for review, report, and recommendation in accordance with the provisions of 28 U.S.C. § 636 and the standing orders of this court. For the reasons stated below, **IT IS RECOMMENDED** the Petition for Writ of Habeas Corpus (rec. doc. 1) be **DENIED** and all pending motions be dismissed as moot.

**I.     Background**

  **A. Status of Immigration Detention and Parole Requests**

Benson Philip Gatu Njuguna, a twenty-seven-year-old native and citizen of Kenya, applied for admission into the United States on August 28, 2019, at the San Ysidro Port of Entry in San Ysidro, California. Rec. Doc. 1-2, p. 8. Petitioner was determined to be inadmissible pursuant to Section 212(a)(7)(A)(i)(I) of the Immigration and Nationality Act and was subsequently detained by ICE.  Rec. Doc. 13-1, p. 7, ¶ 39.  On August 30, 2019, Petitioner was taken into ICE custody. *Id*. On October 2, 2019, he was issued a Notice to Appear in immigration court and on November 6, 2019, he appeared before an immigration judge for a master calendar hearing.  *Id*.  He was provided an opportunity to fill out an application for relief. *Id*.

On December 17, 2019, Petitioner appeared before an immigration judge and submitted his application for relief.  *Id*.  His case was set for an individual merits hearing on March 2, 2020.  *Id*.  After numerous continuances (rec. doc. 1-2, p. 9), a hearing is scheduled with the immigration court on June 5, 2020 (*see* rec. doc. 14, p. 2).

Petitioner first requested parole on October 7, 2019.  Rec. Doc. 13-1, p.7, ¶ 40. ERO New Orleans reviewed his parole request in accordance with ICE Directive No. 11002.1, "Parole of Arriving Aliens Determined to Have a Credible Fear of Persecution or Torture" (Dec. 8, 2009) (2009 ICE Parole Directive) and denied his parole request because he was considered a substantial flight risk.  *Id*.  On April 30, 2020, Petitioner again requested parole. *Id*. ERO New Orleans reviewed this parole

request in accordance with the 2009 ICE Parole Directive, and on April 30, 2020, again denied his parole request based on no change in circumstances and because he is still considered a substantial flight risk. *Id.*

### B. Uniform Precautionary Measures Taken Against COVID-19 at PPIPC

As Njuguna argues that his continued detention is an inherently punitive form of confinement because it needlessly exposes him to grave risk of COVID-19 infection, the precautionary measures taken against COVID-19 at PPICP, set forth by the Respondent and detailed below, are relevant:

Education
- Facilities are educating detainees and staff about COVID-19, including the importance of hand washing and hand hygiene, covering coughs with the elbow instead of with hands, and requesting to seek medical care if they feel ill. See Gvmt. Ex. A, ¶ 34.
- PPIPC has posted COVID-19 educational materials—such as information about the virus, how to prevent its spread (including encouraging social distancing and demonstrating good hygiene practices), outlining the steps ICE is taking relating to COVID-19— throughout PPIPC, including in housing units, gathering spaces and common areas, and medical units. *Id.* ¶ 14. See attached Posters displayed throughout PPIPC. •
- COVID-19 education is provided to all detainees through instructional videos and postings delivered directly to the detainee's personal tablet device. *Id.* ¶ 15.

Personal Protective Equipment
- PPIPC provides to all detainees and staff three (3) times per week Id. ¶ 30. Each detainee and staff member is required to wear them
- Staff are instructed to use PPE. *Id.*

Hygiene and Sanitation
- The PPIPC has increased the frequency of sanitation through the frequent disinfection of high touch surfaces; the cafeteria and recreation yard are sanitized after each pod moves through; and there are increased number of sanitation workers across the facility. *Id*.
- Each detainee is provided with shampoo/bodywash, tissue paper, and other hygiene products twice weekly. Additional hygiene products are furnished upon request. *Id*.
- There have been no shortage of supplies and facility inventory levels are monitored to assure adequate supplies are readily available for future use. *Id*.
- Living areas are sanitized by GEO staff 4 times per shift with sanitizing spray. *Id*.
- GEO has implemented intensified cleaning of surfaces and objects that are frequently touched, especially common areas including telecommunication devices, telephones and adjoining areas, etc. *Id*.

Social Distancing
- The PRR recommends making efforts to reduce the detained population at ICE facilities to 75% of capacity. PPIPC has exceeded that target. *Id*. ¶ 8.
- There is daily monitoring of the population percentage at each housing unit. The goal is to facilitate social distancing, as much as practicable. *Id*. ¶ 9.
- Security staff monitors detainee movement to ensure detainees don't crowd around telephones, board games, communal tables or stand too close while waiting in line for any activity. *Id*. ¶ 12.
- PPIPC has limited professional visits to noncontact visits and suspended in personal social visitation and facility tours. *Id*. ¶ 31.
- All detainees are encouraged to stay 6 feet apart, no more than 4 per table, and the TV benches are marked every 6 foot and the detainees are required to sleep head to foot. *Id*. ¶ 10.
- There are four recreation yards at the PPIPC. Detainees permitted on the recreation yard at a time is limited to between 30-40. The recreation yards are cleaned and sanitized between each use. *Id*. ¶ 13.

Medical Care
- The PPIPC, which manages males only, provides daily access to sick calls in a clinical setting, four observation beds and access to specialty services and hospital care. *Id* ¶ 28.
- Specialty and hospital care are provided through an off-sight provider as needed. *Id*.

- PPIPC provides daily access to "sick calls" (sick call procedure allows detainees the unrestricted opportunity to freely request health care services) in a clinical setting as well as access to hospital care. Specialty and hospital care are provided through and off-sight provider as needed. *Id*. ¶ 28.
- Detainees who present symptoms compatible with COVID-19 will be placed in isolation and tested. If testing is positive, they will remain isolated and treated. If a detainee experiences clinical deterioration, the detainee will be transferred to a local hospital. *Id*. ¶ 25.
- Facilities quarantine detainees who have COVID-19 by placing them in special housing units. *Id*. ¶ 35.
- In cases of known exposure to a person with confirmed COVID-19, asymptomatic detainees are placed in "cohorts" with restricted movement for the duration of the most recent incubation period (14 days after most recent exposure to an ill detainee) and are monitored daily for fever and symptoms of respiratory illness. Those that show onset of fever and/or respiratory illness are referred to a medical provider for evaluation. Cohorting is discontinued when the 14-day incubation period completes with no new cases. Id. ¶ *26*.

Detainee Intake
- The facilities screen all detainee-intakes when they enter, including taking travel and medical histories and checking body temperatures. The facilities also have procedures in place to continue monitoring the populations' health. *Id*. ¶ 33.
- The detainee's responses and the results of these assessments will dictate whether to monitor or isolate the detainee. Detainees who present symptoms compatible with COVID-19 will be placed in isolation (such as in a negative pressure room) and tested. If testing is positive, they will remain isolated and treated. If a detainee experiences clinical deterioration, the detainee will be taken to a local hospital. *Id*. ¶ 25.
- Detainees also are screened for disabilities, identified disabilities are further evaluated, and reasonable accommodations are provided as medically appropriate. *Id*. ¶ 23.
- Facilities practice "cohorting" with detainee-intakes. This practice ensures that new detainees are kept separate from other detainees for the entire 14-day self-quarantine period to reduce the likelihood of an accidental transmission into the facility population by an asymptomatic detainee. *Id*. ¶ 26.

Rec. Doc. 13, pp. 15-18.

According to the Respondents, as of 11 a.m. on May 28, 2020, there were three confirmed cases of COVID-19 among the detainees at PPIPC. *Id*. at p. 18. The three confirmed cases are isolated and receiving medical treatment consistent with CDC guidelines and there were no suspected cases of COVID-19 among the remaining detainees at PPIPC. *Id*. Thus, according to the most recent review of positive cases at PPIPC, the number of confirmed cases fell from twenty-five (25) on May 5, 2020, to just three (3) on May 28, 2020. *Id*.

### C. Federal Habeas Proceedings

On May 1, 2020, Petitioner filed his original petition for a writ of habeas corpus in this Court, alleging that humanitarian parole was justified in light of his medical conditions which elevated his risk of contracting COVID-19. Rec. Doc. 1.

On May 5, 2020, Petitioner filed a Request to Classify Petition as urgent. Rec. Doc. 4. Petitioner's request was granted and on May 7, 2020, the Court issued a memorandum order directing Respondents to address Petitioner's request for humanitarian parole and setting forth an abbreviated briefing schedule. Rec. Doc. 5.

On May 18, 2020, Petitioner filed the subject Amendment to Petition for Writ of Habeas Case Corpus Pursuant to 28 U.S.C. § 2241 and Complaint for Declaratory and Injunctive Relief. Rec. Doc. 8. In the current Amended Petition, Petitioner adds due process allegations pursuant to the Fifth Amendment.

## II. Law & Analysis

Petitioner alleges that, due to his preexisting medical conditions, he is at a higher risk of contracting COVID-19. Rec. Doc. 8, p. 3. In light of his status as a higher-risk detainee, Petitioner argues that PPIPC has failed to adequately protect him against potential exposure to COVID-19. *Id* at pp. 10-14. He argues that all detention centers, in general, lack the adequate containment measures and medical care infrastructure to properly address COVID-19. *Id*. at pp. 13-14. On this basis, Petitioner argues that his confinement is unconstitutional under the Fifth Amendment because of the conditions it imposes upon him: "[b]y subjecting Plaintiff to this risk, Defendants are maintaining conditions that amount to punishment and are failing to ensure safety and health in violation of Plaintiff's due process rights." *Id*. at pp 23-24.

### A. Petitioner's detention is constitutionally permissible.

Both the Petitioner and the Respondents agree that Petitioner's immigration detention is authorized by 8 U.S.C. § 1226(a). Rec. Docs. 1-2, p. 7 and 13, p. 8.

The Supreme Court has held that an alien does not have a constitutional right to be released from detention during the limited period in which removal proceedings are pending. *Demore v. Kim*, 538 U.S. 510, 531 (2003). The right to release, therefore, is a right granted and controlled by statute. *See generally Carlson v. Landon*, 342 U.S. 524, 532-36 (1952). Specifically, when and under what

circumstances an alien may be released while removal proceedings are pending is governed by 8 U.S.C. § 1226(a).

Section 1226 generally "governs the process of arresting and detaining ... aliens pending their removal." *Jennings v. Rodriguez,* 138 U.S. 830, 837 (2018). Section 1226(a) provides that any "alien *may* be arrested and detained pending a decision on whether the alien is to be removed from the United States...." *Misquitta v. Warden Pine Prairie ICE Processing Ctr.*, 353 F. Supp. 3d 518, 521 (W.D. La. 2018) (citing 8 U.S.C. § 1226(a)) (emphasis in original). Detention under 1226(a) is generally referred to as "discretionary detention." *Id*.

Aliens like Petitioner who are detained under § 1226(a) receive numerous procedural protections. Although § 1226(a) does not grant Petitioner an automatic right to release while his immigration proceedings are pending, *see Reno v. Flores*, 507 U.S. 292, 306 (1993), it grants him a number of meaningful opportunities to raise arguments in support of his release. Under § 1226(a), an alien is detained "pending a decision on whether the alien is to be removed from the United States." 8 U.S.C. § 1226(a). "[P]ending such decision," the Department of Homeland Security "may continue to detain the arrested alien" or "may release" the alien on bond. 8 U.S.C. § 1226(a)(1).

Accordingly, this Court finds that Petitioner's detention pending the outcome of his removal proceedings in immigration constitutionally permissible under 8 U.S.C. § 1226(a) and does not violate his Fifth Amendment right to due process.

### B. Petitioner's claims related to COVID-19 are properly brought under 28 U.S.C. § 2241.

To the extent that Petitioner seeks release based on the allegation that during his detention he is being insufficiently protected from COVID-19, Respondents argue that the Court lacks jurisdiction to consider this claim under 28 U.S.C. § 2241, contending that it is a conditions of confinement claim, properly brought pursuant to a civil rights action. This argument is based upon the distinction between claims concerning "conditions of confinement" ("conditions claims") and claims concerning "fact or duration of confinement" ("fact claims").

A detainee may, and should, assert "fact or duration" claims under § 2241. *See Poree v. Collins*, 866 F.3d 235, 243 (5th Cir. 2017). Generally, habeas petitions seek release from custody, while civil rights actions are the proper vehicle to attack unconstitutional conditions of confinement. *Carson v. Johnson*, 112 F.3d 818, 820 (5th Cir. 1997) (first citing *Pugh v. Par. of St. Tammany*, 875 F.2d 436, 439 (5th Cir. 1989), then citing *Cook v. Tex. Dep't of Crim. Justice Transitional Planning Dep't*, 37 F.3d 166, 168 (5th Cir. 1994)). However, the line between claims concerning "conditions of confinement" ("conditions claims") and claims concerning "fact or duration of confinement" ("fact claims") is "a blurry one." *Vazquez Barrera v. Wolf,*

No. 4:20-CV-1241, 2020 WL 1904497, at *10 (S.D. Tex. Apr. 17, 2020) (*quoting Poree v. Collins*, 866 F.3d 235, 243 (5th Cir. 2017). Where an individual is "challenging the very fact or duration of his physical imprisonment, and the relief he seeks is a determination that he is entitled to immediate release," the proper remedy is a writ of habeas corpus. *Preiser v. Rodriguez*, 411 U.S. 475, 500 (1973). The Fifth Circuit has granted habeas relief in the past where the petitioner was seeking immediate release from prison, even where the dissent objected that the case involved conditions of confinement. *Coleman v. Dretke*, 409 F.3d 665, 669-70 (5th Cir. 2005).

Conditions of confinement bear on the constitutionality of continued detention. *Mays v. Dart,* No. 20 C 2134, 2020 WL 1812381, at *6 (N.D. Ill. Apr. 9, 2020). If no set of conditions is sufficient to protect a detainee's constitutional rights, his claim for relief is cognizable in habeas. *See Malam v. Adducci*, No. 20-10829, 2020 WL 1672662, at *3 (E.D. Mich. Apr. 5, 2020), *as amended* (Apr. 6, 2020). Because Petitioner challenges the validity of his continued confinement and because he seeks immediate release from confinement as the remedy, his claims were properly brought under 28 U.S.C. § 2241 and the Court has jurisdiction to rule on his petition for writ of habeas corpus.

**1. Petitioner does not state a constitutional violation.**

However, while Petitioner's claims are properly before this Court, they lack merit. As Petitioner is a civil detainee, his conditions of confinement claims are, like pretrial detainees, governed by the Due Process Clause. *See Hare v. City of Corinth,* 74 F.3d 633, 638-639 (5th Cir. 1996) (en banc). Due process under the Fifth Amendment "requires that a pretrial detainee not be punished." *Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979). Though the state has a recognized interest in detaining defendants for trial, the substantive limits on state action set by the Due Process Clause provide that the state cannot punish a pretrial detainee. *Id*. at 535. In this circuit, the legal standard used to measure the due process rights of pretrial detainees depends on whether the detainee challenges the constitutionality of a condition of his confinement or whether he challenges an episodic act or omission of an individual state official. *Estate of Henson v. Wichita Cty., Tex*., 795 F.3d 456 (5th Cir. 2015).

In *Hare*, the Fifth Circuit created two standards for conditions-of-confinement claims depending on the nature of the allegation. The court held "that the episodic act or omission of a state jail official does not violate a [civil] detainee's due process right to medical care . . . unless the official acted or failed to act with subjective deliberate indifference." *Hare*, 74 F.3d 638-639. Alternatively, "[c]onstitutional attacks on general conditions, practices, rules, or restrictions of pretrial confinement," or "jail condition cases," are governed by the reasonable relation test

articulated in *Bell v. Wolfish,* 441 U.S. 520 (1979). When a Petitioner is challenging his conditions of confinement, this court applies the test established by *Bell* and asks whether the condition is "reasonably related to a legitimate governmental objective." See *Hare*, 74 F.3d at 646. "[I]f a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees qua detainees." *Bell*, 441 U.S. at 539. Where "a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.'" *Id*.

Petitioner argues that the condition of his detention constitutes punishment. The argument is based on two factors: his medical conditions, which he argues increase his risk of COVID-19-related complications, and PPIPC's allegedly inadequate prevention measures. He argues that as a result of those two factors, his detention is presumably not reasonably related to a legitimate governmental interest.

Petitioner may only succeed on his substantive due process claims by establishing that detention does not reasonably relate to a legitimate governmental purpose. *See Dada, et al. v. Witte, et al*., 1:20-CV-458, Rec. Doc. 17 (W. D. La., April 30, 2020). He may make this showing, for example, by proving that, due to his age, immune deficiencies, or other comorbidities, he faces an elevated risk of

contracting the virus, or suffering serious illness from it; that his particular circumstances also heighten these risks; and that preventive measures are difficult or impossible, leaving him unduly exposed to contracting the virus. *Id. (citing Vazquez Barrera,* 2020 WL 1904497, at *5 ("Here, the Court finds that detention of Plaintiffs, who are at high risk of serious illness or death if they contract COVID-19, in MPC, where social distancing and proper hygiene are impossible, does not reasonably relate to a legitimate governmental purpose.").

Petitioners' claims must be distinct in some respect. *See Martinez Franco v. Jennings*, No. 20-CV-02474-CRB, 2020 WL 1976423, at *3 (N.D. Cal. Apr. 24, 2020) ("Franco does not identify, and the Court has not seen, a case finding that increased likelihood of contracting the virus rendered unconstitutional the detention of a person without underlying medical conditions or some other vulnerability."). The Fifth Circuit has explained that "[t]he incidence of diseases or infections, standing alone,' do not 'imply unconstitutional confinement conditions, since any densely populated residence may be subject to outbreaks.'" *Valentine v. Collier,* No. 20-20207, 2020 WL 1934431, at *3 (5th Cir. Apr. 22, 2020) (*quoting Shepherd v. Dallas Cty.*, 591 F.3d 445, 454 (5th Cir. 2009)). This Court has already concluded the same: "[P]risoners are not entitled to release or transfer based solely on generalized COVID-19 fears and speculation." *Riggs v. Louisiana*, No. CV 3:20-0495, 2020 WL 1939168, at *2 (W.D. La. Apr. 22, 2020). Otherwise, the claims of

any prisoner or detainee would be equally meritorious – or equally meritless – notwithstanding their individual situations. That result would be untenable. *Dada, supra.*

To separate meritorious claims from generalized risk, some courts have focused upon underlying detainees' medical conditions, detainees' criminal histories or tendency toward violence, and the detention facility's response to the pandemic. *Dada, supra (citing Vazquez Barrera*, 2020 WL 1904497, at *6). Another court distilled a "nonexhaustive list of factors" to be considered. *Id. (citing Saillant v. Hoover,* No. 1:20-CV-00609, 2020 U.S. Dist. LEXIS 67451, 2020 WL 1891854 (M.D. Pa. Apr. 16, 2020), at *4. This Court will, as it did in *Diaz v. Barr*, No. 20-cv-425 (W.D. La. April 6, 2020) at rec. doc. 20, follow *Dada* and reconcile those approaches.

In addressing the merits of Petitioner's request for habeas relief, the undersigned thus considers the following non-exhaustive list of factors:

(1) whether the petitioner has been diagnosed with COVID-19 or is experiencing symptoms consistent with the disease;

(2) whether the petitioner is among the group of individuals that is at higher risk of contracting COVID-19 as identified by the CDC, due to the petitioner's age or an underlying health condition;

(3) whether the petitioner has been, or has likely been, directly exposed to COVID-19;

(4) the physical space in which the petitioner is detained, and how that physical space affects his risk of contracting COVID-19;

    (5)  the efforts that detention facility officials have made to prevent or mitigate the spread of, or harm caused by, COVID-19;

    (6)  any danger to the community, or to the petitioner's immigration proceedings, that may be posed by the petitioner's release; and

    (7)  any other relevant factors.

*See Dada, supra (citing Saillant*, 2020 WL 1891854, at *4; *Vazquez Barrera*, 2020 WL 1904497, at *6.

Here, most of the *Saillant* factors militate against Petitioner's immediate release.

First, Petitioner has not been diagnosed with COVID-19 and is not experiencing symptoms consistent with the disease.

Second, contrary to his assertions, Petitioner is not at an increased risk of illness from COVID-19 because he (1) does not fall within any class of individuals who are deemed medically vulnerable pursuant to CDC guidelines and (2) his medical conditions are being treated under the appropriate standard of care. Rec. Doc. 13-1. p. 6, ¶ 37. Petitioner is a twenty-seven-year-old man. He alleges that his various medical conditions, including "deep vein thrombosis," "blood clots," "regular headaches, " "post traumatic stress," "immunity deficiency," "allergies to dust [and] smoke," and "past positive test for tuberculosis," put him at a risk of severe illness and death from COVID-19. Rec. Doc. 8, p. 3. In addition to these

issues, Respondents submit that on May 21, 2020, Petitioner first alerted medical staff of a potential for asthma. Rec. Doc. 13-1, p. 6, ¶ 37.

The Respondents argue, and the Court agrees, that the only condition alleged by Petitioner that arguably falls into the "at risk" category is his "immunity deficiency." *See* People Who Are at Higher Risk for Severe Illness, CENTERS FOR DISEASE CONTROL AND PREVENTION, (May 14, 2020) https://www.cdc.gov/coronavirus/2019-ncov/need-extraprecautions/people-at-higher-risk.html). However, this allegation is both vague and disputed by Respondents. The allegation that Petitioner has an "Immunity Deficiency," without more, fails to establish that he is medically vulnerable to COVID-19 such that he should immediately be released from detention. Petitioner has not identified what condition he suffers from that causes his alleged "Immunity Deficiency." *See* If You Are Immunocompromised, Protect Yourself From COVID-19, CENTERS FOR DISEASE CONTROL AND PREVENTION, (May 14, 2020) https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/immunocompromised.html. Moreover, the medical staff at PPIPC, following a "thorough review," has determined that there is no indication/diagnosis that he suffers from any immune deficiency. Rec. Doc. 13-1, p. 7 ¶ 37.

According to medical staff at PPIPC, Petitioner also claims that he has asthma. *Id*. Asthma, too, is a risk factor for COVID-19, but the fact that Petitioner suddenly

developed it subsequent to the filing of his second habeas petition is unconvincing. The medical staff is monitoring the situation and has ordered a pulmonary function test to determine if he has an asthmatic component, despite having no history of asthma prior. *Id*.

Next, Petitioner does not allege that he has been exposed, only that at PPIPC has reported positive cases of COVID-19. Rec. Doc. 1-2, p. 9.

Also, Petitioner's facility, PPIPC, has made substantial efforts in preventing and mitigating the spread of, or harm caused by, COVID-19. *See above*. Notably, according to the most recent review of positive cases at PPIPC, the number of confirmed cases fell from twenty-five (25) on May 5, 2020, to just three (3) on May 28, 2020. *Id*.

Finally, Petitioner has been determined to be a flight risk by the Immigration Court.

"Preventing detained aliens from absconding and ensuring that they appear for removal proceedings is a legitimate governmental objective." *Jennings v. Rodriguez*, 138 U.S. 830, 836 (2018); *Demore v. Kim*, 538 U.S. 510, 523; *Zadvydas v. Davis*, 533 U.S. 678, 690–91 (2001). Detention ceases to bear a reasonable relation to its purpose when the goal is no longer practically attainable. *Jackson v. Indiana,* 406 U.S. 715, 738 (1972); *accord Zadvydas*, 533 U.S. at 690. The prevention of

absconding and ensuring future appearance is attainable by means of continuing to detain Plaintiffs.

Indeed, Petitioner has identified no instances where the government's goal of detaining a particular detainee became unattainable due to COVID-19 risk factors and continued detention. A reasonable relation therefore exists, and thus "does not, without more, amount to 'punishment.'" *Bell*, 441 U.S. at 539. Respondents have a legitimate interest in protecting the public and preventing aliens from absconding into the United States and never appearing for their removal proceedings. *Jennings*, 138 U.S .at 836 (2018); *Demore*, 538 U.S. at 523; *Zadvydas*, 533 U.S. at 690-91. These authorities and objectives are balanced by discretionary authority that permits Respondents to consider whether release is appropriate for certain detainees. See 8 C.F.R. § 236.1(c)(8); 8 U.S.C. § 1182(d)(5).

In sum, Petitioner has not stated a constitutional violation. The Court agrees that the government has an established, nonpunitive, and legitimate interest in detaining Plaintiff pending the outcome of his asylum proceedings. The goal of his detention remains attainable and the evidence does not show keeping him in detention is excessive. Moreover, the public interest is best served by allowing orderly medical processes and protocols to be implemented by government professionals. *See Youngberg v. Romeo*, 457 U.S. 307, 322-23 (1982) (urging judicial deference and finding presumption of validity regarding decisions of

medical professionals concerning conditions of confinement). Furthermore, the Supreme Court has cautioned courts to "be mindful that these inquiries spring from constitutional requirements and that judicial answers to them must reflect that fact rather than a court's idea of how best to operate a detention facility." *Bell*, 441 U.S. at 539.

This Court recognizes that the COVID-19 pandemic presents an extraordinary and unique public-health risk to society, as evidenced by the unprecedented protective measures that local, state, and national governmental authorities have implemented to stem the spread of the virus. *See Sacal-Micha v. Longoria*, No. 1:20-cv-37, 2020 WL 1518861 (S.D. Tex. Mar. 27, 2020). And it is possible that despite ICE's best efforts, Njuguna may be exposed and contract the virus. *Id*. But the fact that ICE may be unable to implement the measures that would be required to fully guarantee Njuguna's safety does not amount to a violation of his constitutional rights and does not warrant his release. *Id. (citing Farmer v. Brennan*, 511 U.S. 825, 832 (1994) ("Prison officials must provide humane conditions of confinement and must take reasonable measures to guarantee the safety of inmates.").

Accordingly,

**IT IS RECOMMENDED** the Petition for Writ of Habeas Corpus (rec. doc. 1) be **DENIED** and **DISMISSED WITHOUT PREJUDICE** to filing a new habeas

petition should his confinement become unconstitutional, and all pending motions be **DENIED** as **MOOT**.

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days from receipt of this Report and Recommendation to file written objections with the Clerk of Court. Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this Report and Recommendation within fourteen (14) days of receipt shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Court, except upon grounds of plain error. *See Douglass v. United Services Automobile Ass'n*, 79 F.3d 1415, 1429–30 (5th Cir. 1996).

THUS DONE AND SIGNED in Chambers this 3rd day of June, 2020.

_____
**PATRICK J. HANNA**
**UNITED STATES MAGISTRATE JUDGE**